UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

In re:                                                                              Case Number: 15-10704-7

    BRADLEY A. WINDESHAUSEN,

        Debtor.

---

    KATHERINE HEBL,

        Plaintiff,
    v.                                                                        Adversary Number: 15-83

    BRADLEY A. WINDESHAUSEN,

        Defendant.

---

## **DECISION**

A relationship—business and romantic—gone wrong led to this adversary proceeding. The Defendant, Bradley A. Windeshausen ("Windeshausen"), filed a voluntary chapter 7 petition on February 28, 2015. The Plaintiff, Katherine Hebl ("Hebl"), filed an adversary complaint on June 2, 2015, alleging an arbitration award of $310,000 is nondischargeable. The arbitration award did not contain any findings of fact or parse out whether the award was for a breach of contract or conversion. Thus, the Court determined an evidentiary hearing on dischargeability was required. At the conclusion of the first day of hearing, Hebl rested. The following day, Windeshausen moved to dismiss under Rule 9015(c).

At the continued hearing, the Court granted in part and denied in part the motion to dismiss. Specifically, the Court found Hebl failed to establish 11

U.S.C. § 523(a)(2)(A)'s element of intent, but found Hebl established a prima facie case for liability under 11 U.S.C. § 523(a)(4). The Court then heard testimony from the Defendant and the Plaintiff's rebuttal testimony. Counsel presented closing arguments and the Court took the matter under advisement.

Based on the record and the evidence submitted, the Court finds the arbitration award is dischargeable. This decision constitutes the Court's findings of fact and conclusions of law.

## Facts

In 2005, Windeshausen and his former business partner, Blake Handrick ("Handrick"), acquired property located in Altoona, Wisconsin, on a land contract. They intended to operate the property as a bar/restaurant. From May 2006 to approximately November 2006, Windeshausen leveraged his solely-owned construction company, Kaizen Builders, LLC ("Kaizen"), to "gut" and renovate the bar. Windeshausen and Handrick formed Untouchables Enterprises, LLC, to hold the real property, formed Whiskey Dicks, LLC (the "LLC") to operate the bar, and entered into a real estate lease between those entities.

In November 2006, Hebl began working at the LLC as a server. After a short time, Windeshausen and Hebl became romantically involved. Sometime between November 2006 and July 2007, Windeshausen's business relationship with Handrick began to break down. Thereafter, an idea was hatched whereby Hebl would buy out Handrick's membership interest in the LLC and become a 50% owner.

On July 25, 2007, after a meeting between Windeshausen, Handrick, Hebl, and her father, Hebl bought out Handrick's interest in the LLC. Hebl and Windeshausen agreed to split the LLC's profits and losses equally according to a Membership Agreement.

Hebl agreed to pay Handrick $65,000 for his interest in the LLC. She paid him an initial down payment of approximately $25,000, and then agreed to pay $1,000 per month for forty (40) months on the balance of the purchase price. Hebl took $1,000 per month from the LLC to pay Handrick the monthly payments.

Windeshausen and Hebl further agreed that in order for her to become a full 50% owner, an investment of $365,000 was required to equal his investment. This included $295,000 to be invested in Untouchables Enterprises, LLC, and $105,000 to be invested in the LLC. Hebl apparently borrowed these amounts from family, agreeing to repay the $295,000 loan at the rate of $1,000 per month and the other loan at the rate of $750 per month. Hebl consulted with her father before making these investments. Hebl also signed a mortgage in favor of her parents, Joseph and Karen Hebl, to secure the $105,000 loan. That mortgage purported to grant a mortgage on the Untouchables Enterprises, LLC, real estate despite the fact it was not granted by that LLC.

Once she became a 50% owner, Hebl took on more responsibility at the LLC. Her primary duties consisted of running the "front of house": hiring/firing employees, human resources, promotions, tending to customers, and training

the staff. Hebl also sometimes made bank deposits, wrote checks, and helped with closeout. Windeshausen's primary duties consisted of managing the "back of house." He handled most of the LLC's finances, working with approximately five different office managers or accountants over 3.5 years. Additionally, Windeshausen fixed things around the LLC during the day, ordered supplies, occasionally tended bar, worked with the vendors, and eventually started acting as a deejay.

Hebl did not take a regular draw. Each month she received money from the LLC to pay the loans to her family and to Handrick. These three loan payments totaled $2,750. She also took cash from the till at times.

Plaintiff and Defendant lived together during the approximately 3.5-year period. Defendant paid the rent and all of their other living expenses from funds withdrawn from the LLC. While Hebl's parents paid her insurance and phone and gave her occasional money, she testified most of her money came from the LLC. Plaintiff and Defendant typically ate at the bar or went out. When they went out, Defendant paid the bill. They would also take others to concerts or shopping. She and employees would have hair and makeup done and she would take employees out. These expenses were paid by the LLC. Finally, she periodically took or was given unspecified amounts of cash from the LLC.

With the loans Hebl arranged from her family, the LLC did not owe "anything significant" to Kaizen for the renovation. Kaizen's employees were paid through the LLC for maintenance and renovation costs. To this end, the

LLC paid Kaizen's employees unspecified payroll amounts from August 6, 2007, to March 17, 2008. This arrangement was, according to Handrick, the continuation of a practice established before Plaintiff's involvement in the business. In addition, at times when a vendor billed Kaizen, the LLC was invoiced for reimbursement. Various witnesses (other than Plaintiff and Defendant) testified that Kaizen employees were constantly performing maintenance and repairs at the LLC, although the descriptions of the extent of that work varied greatly. However, no evidence regarding the actual value of those services, the vendor invoices between the LLC and Kaizen for material reimbursements, or the actual amounts of reimbursements that were alleged not to relate to the bar was ever presented.

     Unfortunately, the relationship between the Plaintiff and the Defendant soured. Hebl confronted Windeshausen about whether she was receiving her equal share and the two struck an alternative working arrangement. This new arrangement did not last long. In 2012, Hebl brought an action in Eau Claire County Circuit Court against Windeshausen alleging conversion and breach of contract.

     Hebl conducted what she describes as an investigation and analysis of certain of the LLC's bank accounts and records, Windeshausen's personal bank accounts, and Kaizen's bank accounts. Hebl created her own selective flow chart and summary of how she believes money flowed from the LLC to Windeshausen's personal and solely-owned business accounts. This summary is self-serving and incomplete. It omits any substantial supporting data.

Windeshausen's accountant, Amy Saykally ("Saykally"), reviewed that summary and tried to reconcile it with the LLC's and Kaizen's books and records. Saykally completed the review and created a spreadsheet— admitted into evidence as Defendant's Exhibit 11—showing a total of $191,625.08 in unexplained cash deposits into Kaizen's account between August 16, 2007, and November 23, 2010. Windeshausen later testified this amount equaled his draws for the same time period from the LLC. Windeshausen clarified that the $191,625.08 in draws also included payments from the LLC to Kaizen for maintenance he performed at the LLC. After reviewing Hebl's bank records for the same time, she deposited cash into her account in the amount of $49,798. She later testified some of this money came from her mother, Karen Hebl, specifically identifying three deposits that totaled $889.31.

Although Windeshausen and the bookkeeper kept all of the financial records for the LLC, Untouchables Enterprises, LLC, and Kaizen, those records and the Defendant's personal bank information were kept in the LLC's office. Hebl knew the location of passwords to the computer records, had access to this information, and at times performed various financial tasks for the business including making deposits and writing checks.

## Discussion

Section 523(a)(4) of title 11 provides "[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." At its core, section 523(a)(4) provides two exceptions to discharge: (1) fraud or

6

defalcation while acting in a fiduciary capacity, and (2) "'fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" *In re Weber*, 892 F.2d 534, 538 (7th Cir. 1989) (*quoting Moore v. United States*, 160 U.S. 268, 269 (1895)).

Under section 523(a)(4), it is Hebl's burden of proof to establish by a preponderance of the evidence that there is a debt that is nondischargeable under section 523(a)(4). *See H. Brooks & Co., LLC v. Yerges (In re Yerges)*, 512 B.R. 916, 921 (Bankr. W.D. Wis. 2014).

### A.    Fraud or Defalcation in a Fiduciary Capacity

Assuming, arguendo, there is a debt, to except it from discharge under section 523(a)(4)'s fiduciary avenue, Hebl must demonstrate that (1) Windeshausen acted as a fiduciary to Hebl at the time the debt was incurred and (2) that debt was caused by fraud or defalcation. *See Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016). The existence of a "fiduciary relationship" is a matter of federal law. *O'Shea v. Frain (In re Frain)*, 230 F.3d 1014, 1017 (7th Cir. 2000). The Seventh Circuit has defined "fiduciary" under section 523(a)(4) as "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *Id.* (*quoting In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994)). Indeed, section 523(a)(4) "reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge in favor of the debtor seeking the discharge and against the creditor resisting

7

discharge." *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996). Section 523(a)(4) does not reach "'a trust [relationship] that has a purely nominal existence until the wrong is committed.'" *Id.* (*quoting In re Marchiando*, 13 F.3d at 1116).

In the present case, a fiduciary relationship did not exist between Windeshausen and Hebl. Windeshausen and Hebl were coequal owners of the LLC. The Parties' Membership Agreement does not delineate specific duties between Hebl and Windeshausen and was not structured to afford Windeshausen any ultimate control or power over the LLC. *See In re Frain*, 230 F.3d at 1017. Rather, based on their respective skills, they agreed to a division of duties. The testimony at trial confirmed Hebl excelled at running the "front of house," while Windeshausen handled the "back of house" consisting of the bar's day-to-day operations. Hebl had interaction with the office managers and bookkeepers, but they primarily reported to Windeshausen. Hebl and Windeshausen had equal signatory authority. At all times relevant, Hebl had access to the LLC's books and records. When a bookkeeper, for example, told her Windeshausen had been withdrawing sums of money from the business for personal use, Hebl investigated the bar's records. Hebl contacted the banks directly to access the LLC's bank account information.

Both Hebl and Windeshausen had equal access to the bank accounts and business records. Equipped with equal membership, Hebl had the authority to not only sign checks on behalf of the LLC, but to make deposits and access records. At times she exercised these rights. No evidence was presented that during the relevant time periods there was any inequality in

8

power or was any information about the business unavailable to Hebl. If her knowledge about the finances was less informed than Windeshausen, the evidence indicates that was because she elected to focus on other aspects of the business and not because of any inequality in power or access. These facts negate a finding that a fiduciary relationship existed between Hebl and Windeshausen.

During trial, Hebl's attorney made a cursory argument, citing Wis. Stat. § 183.0402, that Windeshausen owed fiduciary duties to Hebl. However, as described, federal law defines "fiduciary" under section 523(a)(4). The existence of a fiduciary relationship contemplated by section 523(a)(4) is extremely narrow and arises only when there is an express or technical trust that exists prior to and not as a result of the wrongdoing. *See Patel v. Patel (In re Patel)*, 536 B.R. 1 (Bankr. D.N.M. 2015); *see also, Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934).

The mere fact state law may place two parties in a relationship that may have some characteristics of a fiduciary relationship does not necessarily mean that one party stands in "fiduciary capacity" to the other for debt dischargeability purposes. As described, the dischargeability exception requires the existence of express or technical trust.

Wis. Stat. § 183.0402, cited by Plaintiff's counsel, does not say that members of an LLC are fiduciaries. Rather, it says that members shall not act in a manner that is "[a] willful failure to deal fairly," "willful misconduct," a violation of criminal law, or that is a transaction that derives "an improper

9

personal profit." These requirements are not fiduciary obligations imposed by law. Instead, they are at most a basis for the possible implication of certain fiduciary duties. Thus, the statute does not give rise to a technical trust. Indeed, federal courts have evaluated the corporation statutes of numerous states and held those provisions insufficient to create a technical trust necessary to establish nondischargeability under section 523(a)(4). *See, e.g. Horejs v. Steele (In re Steele)*, 292 B.R. 422, 428-30; *Tway v. Tway (In re Tway)*, 161 B.R. 274, 281 (Bankr. W.D. Okla. 1993); *Fish v. Sadler (In re Sadler)*, Nos. 07-11333, 07-01053, 2007 WL 4199598, at *2 n.1 (Bankr. N.D. Fla. Nov. 26, 2007); *Melquiades v. Hill (In re Hill)*, 390 B.R. 407, 412 (B.A.P. 10th Cir. 2008).

Hebl has failed to provide any evidence to support the existence of an express trust. There is no formal or express trust agreement. Rather, she simply argues that the LLC agreement between the parties providing that Hebl and Windeshausen were equal members itself created obligations that arose by virtue of his status as a member and based on their agreement for a general division of duties. These facts fail to give rise to an express trust.

Accordingly, the Court finds that Windeshausen was not subject to a statutory technical trust. Because Hebl has failed to demonstrate an express or technical trust, the Court finds no fiduciary capacity under section 523(a)(4).

B.  <u>Embezzlement or Larceny</u>

The alternative approach under section 523(a)(4) would be that Windeshausen embezzled the funds or committed larceny. Acts of embezzlement or larceny do not require the concomitant condition of the act

10

while the individual is a fiduciary. *Huntington Nat'l Bank v. Aman (In re Aman)*, 498 B.R. 592, 603 (Bankr. N.D. W. Va. 2013). This path to nondischargeability also requires proof of the existence and amount of a debt.

"Both embezzlement and larceny involve the unlawful conversion of property without the owner's consent." Susan V. Kelly, *Ginsberg & Martin on Bankruptcy* § 11.06[G][1] (5th ed. Supp. 2016). Once again, federal law defines "embezzlement" under section 523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996). A creditor proves embezzlement when she can demonstrate that she "entrusted [ ] property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Id.* at 1173.

As distinguished from embezzlement, "[l]arceny requires that the funds originally come into the [perpetrator's] hands unlawfully." *Bank Calumet v. Whiters (In re Whiters)*, 337 B.R. 326, 332 (Bankr. N.D. Ind. 2006). Federal law defines "larceny" as the "fraudulent and wrongful taking and carrying away the property of another with intent to convert such property to the taker's use without the consent of the owner." *Barristers Abstract Corp. v. Caulfield (In re Caulfield)*, 192 B.R. 808, 818 (Bankr. E.D.N.Y. 1996).

The distinction between embezzlement and larceny is that with embezzlement the debtor's initial possession of the property was lawful, whereas in larceny the debtor took the property illegally. *Ginsberg & Martin on*

11

*Bankruptcy*, *supra*, § 11.06[G][1]; *see also Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 509 (Bankr. N.D. Ill. 2002) ("Embezzlement differs from larceny only in that the original taking was lawful.").

As witnesses, both Windeshausen's and Hebl's credibility ebbed and flowed. Hebl was less credible. It was apparent that her testimony was well practiced. This became all the more pronounced in her testimony on cross-examination. She had crystalline clarity of recollection about most things on direct exam, but her memory of details faltered at times on cross. When asked certain yes or no questions on cross, there were times she attempted to avoid a yes or no answer so she could "explain." While there may have been explanations that would have placed her answers in a context supportive of her claim, no follow-up questions were asked of her on redirect. Windeshausen, on the other hand, appeared less rehearsed and more genuinely earnest in trying to answer questions on cross-examination.

According to the LLC's Membership Agreement, "[m]embers may be compensated for hourly work performed and draws or bonuses shall be paid with <u>unanimous</u> approval of membership." (Emphasis added) It is clear from both Hebl's and Windeshausen's testimony there was no actual process in place for when the two members would take draws. But both members tried to make a determination as to the amount of draws each of them took. Windeshausen testified after review of Defendant's exhibit prepared by Saykally that would be a very close indication of what he had taken from the LLC between 2007 and 2010. Those amounts totaled $191,625.08. Hebl was, at all

12

times, aware that Windeshausen was taking money from the LLC and using it to pay their joint living expenses as well as to pay other of his expenses.

During this same period, Hebl made sporadic deposits into her accounts. Initially they were similar in amount to those of Windeshausen. Over time her deposits became more sporadic and decreased in amount. Some of the cash she deposited was, apparently, money from her mother. She also took $2,750 per month to make payments to Handrick and to her parents. There was inconsistent testimony regarding whether the $40,000 in installment payments to Handrick were fully paid. There was testimony that at some point the $1,750 payments Hebl made to her father stopped. Unfortunately, no evidence was submitted to establish when the payments to Handrick and her parents ceased. In addition, all payments Hebl made were, apparently, from cash she took from the LLC. Approximately $49,800 in deposits were made from August 16, 2007, to December 31, 2011, by Hebl. The exact amount she paid to Handrick and her father was not identified, nor was there effort to explain which deposits into her bank account were from her mother.

With respect to other witnesses, Rachael Oestricher performed bookkeeping and accounting for the LLC. She testified that both Hebl and Windeshausen took cash from the tills. At times each provided an explanation to her for the withdrawal, and at other times neither gave an explanation. Rachael's testimony was that she observed Hebl doing so regularly and more frequently than Windeshausen.

Christine Lubs also worked as a manager/bookkeeper for the LLC for a period of approximately one year. She prepared vendor checks and they were signed by either Hebl or Windeshausen. She observed Windeshausen take cash and there were times she was directed by Windeshausen to pay bills of Kaizen from the LLC account. Lubs confirmed that two Kaizen employees were paid through the LLC payroll. Handrick confirmed this arrangement existed and had been agreed to when he and Windeshausen were the LLC members. Transfers from the LLC to Kaizen and from Kaizen to the LLC were confirmed by Saykally. None of these latter transfers were credited in Hebl's calculations.

Annie Hoffman, a bar staff employee, was invited to apply for employment by Hebl. Throughout the period of her employment, there was some type of building or maintenance under way. When she first began employment, Hebl was the manager and Windeshausen worked in the office. Over time, however, Hoffmann said this changed and that Windeshausen also undertook the tasks of assisting in the "front of house" and acting as a deejay. According to Hoffman, Hebl treated the staff well—taking them out, having hair and makeup done for staff and herself, and paying for meals and other items for herself and the staff in cash.

The Defendant was an owner with rights to withdraw funds from the LLC just as Hebl possessed equal rights. Hebl was aware Windeshausen was taking funds and did not object for approximately 3.5 years. Therefore, it cannot be said the funds came into his hands unlawfully for the purpose of a claim of larceny.

The Plaintiff's argument is essentially that she was entitled to receive amounts equal to what the Defendant received, and to the extent he received more, he took her property. If the alleged embezzler merely owes a sum to the one claiming embezzlement, "rather than holding it that belong[s] to another, there is no embezzlement." 99 A.L.R. Fed. 124 (originally published 1990). *See, e.g., JP Morgan Chase Bank, NA v. Algire (In re Algire)*, 430 B.R. 817 (Bankr. S.D. Ohio 2010). While used for some individual expenses, it is undisputed that funds taken were also used for joint living expenses and Hebl consented to—or at least acquiesced in—having Windeshausen pay those expenses from LLC funds. Embezzlement also requires proof of intent. *In re* Weber, 892 F.2d 534, 538-39 (7th Cir. 1989); *see also Digital Sys. Eng'g v. Moreno (In re Moreno)*, 414 B.R. 485, 491 (Bankr. W.D. Wis. 2009) ("Stated differently, embezzlement is proven by demonstrating that '(1) the debtor appropriated funds for his or her own benefit; and (2) the debtor did so with fraudulent intent or deceit.'") Certainly Defendant intended to take LLC funds to pay expenses and he was aware the gross amounts he took exceeded the gross amounts Hebl took. This alone, however, does not establish the required moral turpitude or intentional wrong needed to establish embezzlement. *Moore v. Hermes (In re Hermes)*, 340 B.R. 369 (Bankr. C.D. Ill. 2006); *Kriescher v. Gibson (In re Gibson)*, 521 B.R. 645 (Bankr. W.D. Wis. 2014).

The Plaintiff has failed to establish the elements of embezzlement or larceny by a preponderance of the evidence. *See Garner v.* Grogan, 498 U.S. 279, 291 (1991).

C.  A Debt

In order to establish that a debt is nondischargeable, the complainant must also establish the existence and amount of the debt. *Orumwense-Lawrence v. Osula (In re Osula),* 519 B.R. 361, 377 (Bankr. D. Mass. 2014). Hebl received a 1099 for the funds she took and used to pay her parents. However, at no point did she testify to or present any 1099. Thus, it is impossible based on the record to confirm the amounts she took for those payments. There was no evidence presented by Plaintiff as to amounts she paid Handrick. The testimony suggested he had been paid for his interest in the LLC.

The arbitration award does not identify any ground for the determination of liability or the amount. The state court complaint asserted two claims—breach of contract and conversion. The testimony regarding the possible amount of the claims—in the arbitration and before this Court—included an estimate that if Windeshausen's monthly expenses were between $10,000 and $15,000 per month, then it was assumed he must have taken enough to pay those sums and that Hebl would be entitled to an amount equal to those sums times 42 months divided by 2 (or $210,000 to $315,000). Hebl presented a vastly larger summary calculation at the arbitration and in this case based on her review of bank account records.[1] Those amounts consist

---

[1] This calculation was a summary of months and dollar amounts from bank statements that Hebl presumed were deposits from the LLC. She did not submit the supporting documents from which the summary was prepared. She added to this amounts of cash she estimated had existed and that were, in her words, "stolen" and thus not deposited by Defendant.

16

of nothing better than guesses based on innuendo and suspicion. Without explanation, those amounts were rejected by the arbiters. It is possible to conjecture the arbitration award was an estimate of profit divided by 2 under the Member Agreement. Further, neither Hebl's conjectures nor the award credit or take into account any calculation of the amounts she withdrew or took or of the fact that portions of any such amounts were used to pay all of the joint living expenses of the Plaintiff and Defendant. The arbitration award does not match any calculations presented. This Court is left to speculate as to any basis for the award.

    Hebl was aware Windeshausen was taking money from the LLC to pay living expenses including rent, utilities, and food. In fact, the undisputed testimony was that at times Hebl suggested Defendant take more than her draw because rent was due and she wanted the rent paid. She was aware he bought a new truck and had support expenses for his children. She knew the amounts she was taking, was aware he was also taking money, and yet did not object or complain until years after the pattern of draws was established and her relationship with Windeshausen soured. The LLC also purchased or paid off the Saturn Hebl drove, insured it, and paid many other expenses of operating the car as well. These amounts were not credited in any of Hebl's calculations.

    There was no evidence of how much Kaizen received from the LLC by having its payroll picked up by the LLC. It is not possible for the Court to determine whether the amounts paid to the Kaizen employees were reasonable

17

for the amount of work done at the bar. Thus, Hebl failed to establish by a preponderance of the evidence that the LLC had overpaid the Kaizen employees for work done at the bar.

The Plaintiff failed to establish the amount of any debt that resulted from acts that might constitute a basis for nondischargeability under section 523(a)(4). It is not the role of the Court to calculate the amount of the debt. It is the Plaintiff's burden to present evidence of the amount. At best, the Plaintiff established Defendant had draws of $191,625.08. Assuming Hebl took $40,000 to pay Handricks and $1,750 per month to pay her parents over the same period used to estimate the draws of Windeshausen, those amounts plus the deposits to her account total $163,298. The difference in draws would then be $28,327. While this amount (or any other difference in draws) may be a debt owed under the LLC agreement in order to equalize draws, it is clear Hebl was aware of disparate draws and that part of the difference was attributable to the fact Defendant was paying virtually all of the living expenses for the parties. Hebl has failed to establish the amount of debt by even a preponderance of the evidence.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered separately.

Dated: March 3, 2017

                          BY THE COURT:

                          _____
                          Hon. Catherine J. Furay
                          U.S. Bankruptcy Judge